UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

JANET SNYDER,                                          )
7832 Surfcrest Court                                   )
Las Vegas, Nevada 89128,                               )
                                                       )
KAREN HUNZIKER,                                        )
3055 Sly Park Road                                     )
Pollock Pines, California 95726,                       )
                                                       )          Case No.
and                                                    )
                                                       )          CLASS ACTION
HOWARD GILL, JR.,                                      )
2954 Bald Mountain Road                                )          JURY TRIAL REQUESTED
Burnsville, North Carolina 28714,                      )
                                                       )
on behalf of themselves and others                     )
similarly situated,                                    )
                                                       )
                        Plaintiffs,                    )
                                                       )
            vs.                                        )
                                                       )
JULIÁN CASTRO, in his capacity as                      )
SECRETARY OF THE UNITED STATES                         )
DEPARTMENT OF HOUSING AND                              )
URBAN DEVELOPMENT,                                     )
                                                       )
451 7th Street S.W.                                    )
Washington, DC 20410,                                  )
                                                       )
                        Defendant.                     )
_____              )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, on behalf of themselves and others similarly situated, bring this action against

Julián Castro, Secretary of the U. S. Department of Housing and Urban Development ("HUD"),

and allege and state as follows:

1

**INTRODUCTION**

1.     Plaintiffs challenge HUD's failure to protect them and other surviving spouses of reverse mortgage borrowers from foreclosure and displacement, as required by the reverse mortgage statute, 12 U.S.C. § 1715z-20(j), titled "Safeguard to Prevent Displacement of Homeowner."  As a result of HUD's failure, Plaintiff Janet Snyder is facing a sale of her property on **April 27, 2015,** Plaintiff Karen Hunziker, is facing a sale of her property on **May 15, 2015,** and Plaintiff Howard Gill, Jr., is facing a sale of her property on **July 1, 2015.**

2.     HUD has recently made clear —in a Determination on Remand and in guidance to lenders — that despite this Court's ruling that its regulations requiring lenders to foreclose on surviving spouses violate the reverse mortgage statute, it is only providing an option to lenders to defer foreclosure to a small number of surviving spouses who sued it in prior actions.  Its primary defense for its failure to follow the law is expense.

3.     The only form of relief HUD has proposed for the Class is the "Mortgagee Optional Election," ("MOE") which HUD calls a "discretionary act" on its part, and for which few, if any, surviving spouses can qualify.  In addition to the prohibitive criteria, HUD has made the process of applying for this relief cumbersome and time-consuming for servicers.

4.     HUD has put forward a legal defense for refusing to allow lenders to defer foreclosure that is nonsensical.  The new regulations it is proposing, which allow lenders to foreclose on surviving spouses is illegal just like the current regulations are.

5.     Plaintiffs bring this action on behalf of themselves and all others similarly situated under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.,* for judicial review of final agency actions by HUD.  Plaintiffs seek a declaration that HUD's regulations and guidance violate Subsection (j), and an order enjoining HUD from requiring lenders to foreclose on

surviving spouses, and from paying claims where lenders can assign the loan rather than foreclose on protected spouses.  Unless this Court enjoins HUD to comply with federal law, Plaintiffs will soon lose their homes.

## THE PARTIES

6.     Plaintiff Janet Snyder resides at 7832 Surfcrest Court, Las Vegas, Nevada.  She is currently facing foreclosure proceedings as a result of Defendant's failure to protect surviving spouses of reverse mortgage borrowers from foreclosure.

7.     Plaintiff Karen Hunziker resides at 3055 Sly Park Road, Pollock Pines, California.  She is currently facing foreclosure proceedings as a result of Defendant's failure to protect surviving spouses of reverse mortgage borrowers from foreclosure.

8.     Plaintiff Howard Gill, Jr. resides at 2954 Bald Mountain Road, Burnsville, North Carolina.  He is currently facing foreclosure proceedings as a result of Defendant's failure to protect surviving spouses of reverse mortgage borrowers from foreclosure.

9.     Defendant Julián Castro is the Secretary of the Department of Housing and Urban Development, a cabinet-level federal agency.  HUD's headquarters is at 451 7th Street S.W., Washington, DC, 20410.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(e).

## NATURE OF THE CASE

### The HECM Program

12.     The HECM program was originally authorized by the Housing and Community Development Act of 1987, Pub. L. No. 100-242, 101 Stat. 1815 (1988); 12 U.S.C. § 1715z-20. Under the program, the United States Government insures reverse mortgages originated by private lenders.

13.     A reverse mortgage is a loan that allows older homeowners to convert part of the equity in their homes into cash.  It is the "reverse" of a traditional mortgage, in which the borrower repays the borrowed sum on a monthly basis: reverse mortgage borrowers receive money in exchange for their home equity. Borrowers can choose to receive the loan proceeds in a lump sum, on a monthly basis, or they can draw on a line of credit periodically as needed. Reverse mortgage borrowers are not required to make monthly or other periodic payments to repay the loan.  Instead, the loan balance increases over time, and the loan does not become due and payable until one of a number of defined events occurs.  12 U.S.C. § 1715z-20(j).

14.     The HECM program was first created as a pilot program that was permitted to insure up to 2,500 reverse mortgages.  Since then, Congress has made the program permanent and has greatly expanded it.  From the program's inception through September 2012, HUD has insured more than 770,000 HECMs. Of these, over 595,000 HECMs are still outstanding.[1]

15.     HUD administers the HECM program, and issued its governing regulations. Interpretations of the HECM regulations are provided in HUD's Handbook, 4235.1 REV-1 (1994), Home Equity Conversion Mortgages, in a series of "mortgagee letters" directed to private lenders participating in the program, and in its online "HECM Servicing Frequently Asked Questions."

---

[1] *See Total HECM Cases Endorsed for Insurance by Fiscal Year of Endorsement and Borrower Characteristics, September 30, 2012,* found at http://1.usa.gov/1izjHJZ (viewed March 3, 2015). This is the latest date for which data are available on HUD's website.

16.     Recognizing the complex nature of the reverse mortgage product, the HECM statute has always required specific disclosures about the rights, limited liability, costs and other terms of the mortgage, and has required that homeowners receive counseling before taking out a loan that HUD would insure under the program.  12 U.S.C. § 1715z-20(e) & (f).  Throughout the history of the HECM program, HUD has not provided this counseling directly, but has approved private organizations to provide it.  While HUD has recommended that non-borrowing spouses also receive counseling, it did not require such counseling until 2011.

17.     HUD does not originate HECMs.  They are originated by private lenders, who generally sell them into the secondary market.

18.     In addition to the HECM statute and regulations, all HECM transactions are governed by a first Note and Mortgage between the lender and borrower, a second Note and Mortgage entered into between HUD and the borrower, a Home Equity Conversion Loan Agreement entered into by the lender, the borrower, and HUD, and the insurance contract between HUD and the lender.

19.     HUD's regulations at 24 C.F.R. § 206.1 through 206.211 <u>are</u> the insurance contract between HUD and lenders.  No written binder or separate document sets forth the terms of the HECM insurance.  Instead, the "contract of insurance" is defined as "the agreement evidenced by the issuance of a Mortgage Insurance Certificate or by the endorsement of the Commissioner upon the credit instrument given in connection with an insured mortgage, *incorporating by reference* the regulations in this subpart and the applicable provisions of the Act." 24 C.F.R. § 203.251 (j).  Borrowers and their heirs are third-party beneficiaries of the FHA insurance contract.

20.     Any lender intending to participate in the HECM program for a particular loan must extend the loan in compliance with the HECM statute and HUD's regulations.  If approved, HUD issues an insurance certificate for the loan. Mortgage insurance premiums are paid by the borrower from the equity in the home.  An initial mortgage insurance premium is paid from the funds at closing, and ongoing monthly premiums are added to the balance of the loan securing the homeowner's residence at the rate of 0.5% per annum of the loan balance, compounded monthly.

21.     HECM insurance provides a number of benefits to the homeowners, whose home equity funds the premiums.  It provides protections for homeowners if the lender defaults on its obligations under the mortgage, *see* 24 C.F.R. §§ 206.117, 206.121, and ensures that neither borrowers nor their heirs will ever have to pay more than the value of the property to satisfy the loan.  24 C.F.R. §§ 206.123(b); 206.125(c).

22.     HUD's issuance of an insurance certificate for a particular loan "shall be conclusive evidence of the eligibility of the loan or mortgage for insurance." 12 U.S.C. § 1709(e).

**Claims on the Insurance Fund**

23.     HUD regulations permit lenders to file an FHA insurance claim if the mortgage is assigned to HUD, the lender forecloses on the property, or the borrower sells the property for less than the mortgage balance. 24 C.F.R. § 206.123. *See also* 24 C.F.R. §§ 206.127, .129.

24.     Since the beginning of the program, HUD has accepted assignment of over 30,000 mortgages.  These mortgages are serviced by a HUD contractor, DEVAL LLC.

25.     The statute states that the obligation of the homeowner (including the non-borrowing spouse) to satisfy the mortgage must be deferred until the homeowner's death, sale of

the home, or other events to be determined by HUD.  12 U.S.C. § 1715z-20(j).  HUD's

regulations add to this list of "due and payable" events the mortgagor's change of principal

residence; the failure to perform an obligation of the mortgage, and the mortgagor's failure to

occupy the property for more than 12 consecutive months because of physical or mental illness.

24 C.F.R. § 206.27(c)(2).

26.     If and when a due and payable event occurs, HUD regulations require lenders to

proceed with foreclosure and sale of the property according to timelines and procedures set out

in 24 C.F.R. §§ 206.125-129 in order to perfect their insurance claim.

### HUD Has Failed to Protect Spouses from Displacement

27.     The reverse mortgage statute includes a section titled "Safeguard to prevent

displacement of homeowner." This provision states that Defendant "may not insure a home

equity conversion mortgage under this section unless such mortgage provides that the

homeowner's obligation to satisfy the loan obligation is deferred until the homeowner's death, the

sale of the home, or the occurrence of other events specified in regulations of the Secretary."  12

U.S.C. § 1715z-20(j).  The provision further states that "[f]or purposes of this subsection, the

term 'homeowner' includes the spouse of a homeowner," so the death of a spouse – even one

who is not named on the HECM – does not trigger the obligation to pay off the mortgage.  *Id.*

28.     The legislative history on the passage of the HECM legislation confirms the plain

meaning of this statutory provision.  The Senate Report on the legislation states that HECM

mortgages shall "defer[ ] any repayment obligation until death of the homeowner *and* the

homeowner's spouse . . ." (emphasis added).[2]

---

[2] Report 100-21 by the Senate Committee on Banking, Housing and Urban Affairs
accompanying S. 825, 100th Congress, Section 135 (reporting on Subsection 254(j)).

29.     HUD has never implemented the plain meaning of the anti-displacement statutory mandate.  HUD's regulations substitute the term "mortgagor" for "homeowner" and "spouse," and state that the duty to satisfy the mortgage occurs when the *"mortgagor* dies and the property is not the principal residence of at least one surviving *mortgagor. . .* " 24 C.F.R. § 206.27(c) (emphasis added).  HUD defines mortgagor as "each original borrower under a mortgage.  The term does not include successors or assigns of a borrower."  24 C.F.R. § 206.3.

30.     HUD's mortgage documents further contravene the statutory protection.  The standard Mortgage, also written by HUD, which requires its use in all HECM transactions, terminates the mortgage upon the death of the borrower, regardless of whether a non-borrowing spouse survives the borrower.

31.     The HUD regulations' substitution of the term "mortgagor" for "homeowner," and their adoption of a definition of "mortgagor" that is contrary to and more limited than the HECM's statutory definition of "mortgagor," makes the HECM "due and payable" upon the death of a borrowing spouse.  Thus, the regulations ignore a key statutory protection for the surviving spouse who is not named on the HECM, as provided by 12 U.S.C. § 1715z-20(j).

32.     In *Bennett v. Donovan*, the Court held that HUD's regulation at 24 C.F.R. § 206.27(c)(i) was contrary to the plain language of the statute and illegal as applied to the plaintiffs, because it permitted their loan obligations to come due upon the death of their borrower spouses.  The Court remanded to HUD to determine relief consistent with its decision.

### HUD's Determinations on Remand in *Bennett* and *Plunkett*

33.     In June 2014, HUD issued two determination on remand, Dkt No. 26-2 (*Bennett*) (June 4, 2014); Dkt. No. 32-1 (*Plunkett*) (June 24, 2014).  In the *Bennett* determination, HUD first identified the legal error as its "endorsement for insurance of these two HECMs," and stated

8

that it was unable to "unwind or terminate" the insurance contracts with lenders.  Dkt. No. 26-2

at 9-11.  HUD identified four other "potential equitable remedies," each of which it rejected as

"inappropriate, impermissible, or otherwise inequitable."[3]

34.    Despite its original conclusion that accepting assignment of the mortgages was

not a viable option, in its Determination on Remand in *Plunkett*, HUD ultimately concluded that

accepting assignment of mortgages in which there were no disqualifying conditions was the

"only potentially viable form of relief."  Dkt. No. 32-1 at 5.

35.    HUD proposed that it would exercise its discretion to allow mortgagees, upon the

death of the borrower spouse, to assign mortgages to HUD under what it called the Mortgagee

Option Election ("MOE").  Dkt. No. 32-1 at 6-7.  Through the MOE, the mortgagee may, in its

sole discretion, elect to assign such a mortgage to HUD provided that, at the time the election for

assignment is made:

1.    The Non-Borrowing Spouse would have had a Principal Limit Factor ("PLF") greater than or equal to the PLF of the HECM borrower spouse ("PLF Test") or the Non-Borrowing Spouse's PLF would have resulted in a current principal limit that is greater than the current unpaid principal balance ("Principal Limit Test"), provided that the Maximum Claim Amount is not exceeded;

2.    The Non-Borrowing Spouse was legally married to the HECM mortgagor at the time of origination and remained married throughout the HECM mortgagor's life;

3.    The Non-Borrowing Spouse has title to the property or a legal right to remain in the property;

4.    The HECM is not in default for any other reason; and

---

[3] *Id.* at 2, 10-17.  The four potential "equitable" remedies were requesting that the mortgagees forego foreclosure, accepting assignment of the mortgages, consenting to allowing the non-borrowing spouse to assume the mortgage; and consenting to the mortgagees paying the non-borrowing spouse to provide a deed in lieu of foreclosure.

     5.      There are no allegations or claims that would invalidate the HECM or any such allegations or claims have been judicially resolved in favor of the Mortgagee.

Dkt. No. 32-1 at 6 (footnotes omitted).

     36.      HUD placed no time restrictions on access to relief under the MOE.  It conceded that if a non-borrowing spouse had a tax or insurance default, or if he or she wished to "buy-down" the mortgage to the spouse's principal limit, the spouse could set up a payment plan with the mortgagee, which could assign to HUD at a later date when the payments had been made: "nothing in HUD's decision precludes the mortgagee from instituting a payment plan after an initial determination that the plaintiff is currently not eligible for the assignment option."  Dkt. No. 44 at 11.  HUD retracts this commitment in its Mortgagee Letter.

     37.      Because younger, non-borrowing spouses will always have PLFs that are lower than the PLFs of older, borrowing spouses, the younger of the two spouses will never qualify for relief under the Principal Limit Factor Test.  It appears that under the alternative "Principal Limit Test," few if any spouses will qualify, because they would have to pay down their loan balances by significant amounts that they cannot afford.  For example, Financial Freedom informed Mrs. Hunziker that she would have to pay approximately $62,640 to qualify for MOE relief, on a HECM originated in 2006.

     38.      The MOE provided no relief for plaintiffs in the *Bennett* and *Plunkett* cases. They challenged the MOE under the APA; they also challenged HUD's application of its foreclosure deadlines at 24 C.F.R. § 206.125 to loans that are not due and payable.[4]

---

[4] The *Bennett* and *Plunkett* cases were consolidated by the Court under *Plunkett v. Donovan,* Case No. 1:14-cv-326 (ESH) (*Plunkett II"*), which became *Plunkett v. Castro* when Julián Castro became HUD Secretary.

39.     In *Plunkett II*, the Court upheld the legality of the MOE as articulated in the

Plunkett Determination on Remand, and as explained by HUD in its pleadings.  The Court also

held that despite HUD's claim to have "considered all potential options on remand," its

determinations on remand were arbitrary and capricious because HUD failed to consider relief

arising from HUD's Trigger Inapplicability Decision ("TID").  Dkt. No. 47 at 31.

## Trigger Inapplicability Decision

40.     Following the Plunkett Determination on Remand, Plaintiffs filed a complaint

contending that HUD could not require lenders to foreclose on surviving spouses, because any

such requirement violated the statute.  In its summary judgment brief, HUD conceded that in the

absence of an event of default under 24 C.F.R. § 206.27(c), the loans at issue in the *Bennett* and

*Plunkett* cases are not due and payable, and that HUD's regulations requiring the mortgagees to

foreclose on them do not apply.  Dkt. No. 37-1 at 24.  This, HUD stated, was the "automatic"

result of the Court's decision in *Bennett II*.  Dkt. No. 44 at 8.  "HUD now permits the mortgagees

to hold plaintiffs' spouses' mortgages unless and until some other event of default occurs, and

makes assignment to HUD available . . .  when the mortgage loan balance reaches 98% of the

maximum claim amount . . ."  *Id.* at 1.

41.     Because HECMs are *only* due and payable on the occurrence of a triggering event

in 24 C.F.R. § 206.27(c), the Court called this the Trigger Inapplicability Decision.

42.     In *Plunkett II,* the Court rejected HUD's assumption that the error of law

identified in *Bennett II* did not apply to other surviving spouses, in part, because the decision was

made according to *Chevron* Step One. *Plunkett II* at *43-44.

43.     The Court further stated that, as a federal agency, HUD is required to treat similar

cases in a similar manner unless there is a legitimate reason for failing to do so.  *Id.* at *48. The

Court remanded to HUD to "consider whether the remedy of the TID applies to non-borrower surviving spouses." *Id.* at *49.

44.     In late 2014 and early 2015, HUD sent letters to the mortgagees in the *Bennett, Plunkett,* and *Harris* cases, offering to allow them to hold the mortgages until the balances on the mortgages reach 98% of maximum claim amounts, after which HUD would accept assignment.

45.     However, HUD for the first time imposed four conditions on TID relief, which it renamed "Hold Election."

> a.     The loan must not be due and payable for any reason other than the death of the Non-Borrowing spouse, either at the time the mortgagee elects the TID, or at the time it seeks assignment to HUD;
>
> b.     The Non-Borrowing Spouse must have an ownership, leasehold, or other legal right to remain in the property, must physically reside at the property, must have resided there when the loan was originated, and must continue to reside, uninterrupted, at the property for the balance of his or her natural life.
>
> c.     The Non-Borrowing Spouse must provide proof that he or she was married to the deceased borrower at the time of the origination of the HECM and must have remained married until the death of the borrower, and
>
> d.     There can be no outstanding asserted claims by the borrower's estate, the Non-Borrowing Spouse or any other heir that could invalidate the HECM, or such claims must be judicially resolved in favor of the mortgagee.

46.     The letters to these mortgagees also offered the Mortgagee Optional Election. Both the Hold Election/TID[5] and Mortgagee Optional Election were subject to many more qualifications and conditions than HUD had originally stated.

---

[5] Because the relief is the automatic result of the holding that there has been no trigger making the mortgages due and payable under the regulations, Plaintiffs contend that "Trigger Inapplicability Decision" is a more accurate description.

47.     In particular, the letters required mortgagees to opt for TID or MOE within 30

days of receipt of the letter, after which the spouses were required to establish that they met

HUD's various conditions within an additional 30-day period.

48.     HUD had assured this Court that "nothing in HUD's decision precludes the

mortgagee from instituting a payment plan after an initial determination that the plaintiff is

currently not eligible for the assignment option."  Nor, HUD said, would "any decision by HUD

not to accept assignment (*e.g.,* because of nonpayment of taxes) foreclose future requests by the

mortgagee with regard to the same loan after repayment has been effectuated."  Dkt. No. 44 at

11.

49.     Yet HUD's letters to mortgagees in *Bennett*, *Plunkett,* and *Harris* stated that these

spouses and mortgagees were required to resolve any tax or insurance defaults *prior* to the

mortgagee's final decision to accept the TID or MOE, even though HUD would not accept

assignment under the TID until the mortgage reached 98% of MCA.

50.     In the event that all of the requirements for TID or MOE are not met within 60

days of the dates of the letters, HUD advised mortgagees that, to ensure full payment of

insurance claims, they must proceed with foreclosure under the terms of the original mortgages

and contracts of insurance *i.e.*, according to HUD's regulations. Mortgagees who accept either of

these options are required to enter into amendments of the insurance agreements with HUD,

which purportedly defer the due and payable status of these loans under the insurance contracts

based on the death of the borrowing spouse.

## Determination on Remand in *Plunkett II*

51.     On February 6, 2015, HUD issued its Determination on Remand in *Plunkett II*,

which explained Mortgagee Letter 2015-03, issued on January 29, 2015.  Dkt. No. 67-1.

Mortgagee Letter 2015-03 described the TID/Hold Election as the "unintended consequence of the specific application" of the ruling in *Plunkett v. Castro,* and refused to extend TID relief to any surviving spouse, except for seven individuals who had sued HUD, because it "imposes a financial risk to the insurance funds that is simply too great."  *Id.* at 3-4, 9-10.

52.     In this Determination and in Mortgagee Letter 2015-03, HUD purported to use authority of the Reverse Mortgage Stabilization Act of 2013 ("RMSA"), 12 U.S.C. § 1715z-20(h)(3), to make changes and additions to its reverse mortgage regulations that violate the statute, with no opportunity for notice and public comment.

53.     The RMSA states that HUD "may establish, by notice or mortgagee letter, any additional or alternative requirements that the Secretary, in the Secretary's discretion, determines are necessary to improve the fiscal safety and soundness of the program authorized by this section, which requirements shall take effect upon issuance."

54.     Among other things, Mortgagee Letter 2015-03 includes the following:

a.     It amends 24 C.F.R.§ 206.27(c) to state that any event of default under the mortgage is a due and payable event for purposes of the regulations, thereby reinstating the death of the borrowing spouse as a due and payable event, despite the decision in *Bennett II*.  Dkt. No. 67-1 at 11, 13.

b.     It amends 24 C.F.R.§ 206.125 to include a requirement that the lender notify HUD whenever the loan is eligible to be called due and payable under the terms of the mortgage, thereby creating a new "trigger" for HUD's timelines for foreclosure.  *Id.* at 11.

c.     It amends 24 C.F.R. § 206.129(d) to add to the definition of "due date" the date the mortgagee notifies HUD that it will not utilize MOE or that the mortgage is ineligible for MOE.  *Id.*

d.     It amends 24 C.F.R.§ 206.107 by declaring that "no mortgage is eligible for assignment where the last surviving borrower has died and the mortgage is eligible for due and payable status under the terms of the original mortgage. . . unless the mortgagee elects the Mortgagee Optional Election Assignment and all conditions and requirements for [MOE] are satisfied."  *Id.* at 10.

55.     HUD now states that offering the same relief to other surviving spouses as was offered to the *Bennett, Plunkett* and *Harris* plaintiffs would present an unacceptable financial risk to the FHA funds that insure HECMs.  *Id.* at 4.  HUD states in Mortgagee Letter 2015-03:

> The Hold Election when applied to the universe of mortgages involving Non-Borrowing Spouses of borrowers imposes a financial risk to the insurance funds that is simply too great. FHA's obligation to protect the soundness of the insurance funds makes it impossible to offer this option broadly. Thus, even though it also poses a (lesser) financial risk to the funds, the only alternative path to claim payment that FHA will permit mortgagees to elect is the Mortgagee Optional Election Assignment.[6]

56.     In its Determination on Remand, HUD further states:

> HUD's risk analysis suggests that the Hold Election, if broadly applied to all pre-August 4, 2014 HECMs where a non-borrowing spouse remains in residence after the borrower's death, could produce very substantial losses in the insurance funds, far greater than those likely to be produced by extension of the MOE to all such HECMs.  Using data from the 2010 Survey of Consumer Finances, HUD estimated the percentage of senior homeowners that are married and estimated the age differences of the spouses, concluding that about 20% of the married seniors in the HECM program have non-borrowing spouses.  Applying data from the Centers for Disease Control to estimate life expectancies of the borrowing and non-borrowing spouses, and assuming no further cash draws after the borrowing spouse exists the home HUD has estimated the cost of the Hold Election to the insurance funds if it were made broadly available and all mortgagees with surviving spouses made use of it to be $1.769 billion.[7]

57.     Even if cost were a defense to violation of the law, HUD has failed to establish it here.  Its analysis is cursory, its assumptions and analyses are explained poorly or not at all, and it contradicts analysis provided in the Administrative Record.  It is arbitrary and capricious.

---

[6] Dkt. No. 67-1 at 9-10.

[7] Dkt. No. 67-1 at 4.

58.     HUD states that it assumed that 20 percent of *married* borrowers had non-borrowing spouses, but HUD's cost estimate in the Administrative Record is based on the assumption that 20 percent of *all* borrowers had non-borrowing spouses, which would yield a much bigger number.[8]  In addition to providing no empirical basis for either "assumption," it appears that HUD has also assumed that in every case where there is a borrower with a non-borrower spouse, the borrower spouse will *always* die first, and the surviving spouse will *always* want to stay in the property for the rest of his or her life, necessitating a claim on the insurance fund.  Of course, many non-borrower spouses will predecease their borrower spouses; many others will sell or leave their homes, either for another residence or for a nursing home, both before and after the death of the borrower.  Moreover, many borrowers with non-borrower spouses will sell their homes before they die.  It does not appear that HUD accounted for any of this.

59.     The only source HUD provides for its "assumptions" -- the Federal Reserve Board's Survey of Consumer Finances -- does not analyze reverse mortgages at all.  It analyzes general changes in family income and net worth.[9]

60.     What HUD fails to acknowledge is that it can determine the number of borrowers with non-borrowing spouses by reference to its own files.  The marital status of every borrower is disclosed on the first page of the HECM loan application.[10]  Any loan to a sole borrower who

---

[8] HUD1396.  The first part of the administrative record in this case was filed in *Bennett v. Donovan*, Case No. 14-CV-1017 ESH, before it was consolidated with this matter.  *See* Minute Order, June 30, 2014.

[9] *See* Jesse Bricker et al., Changes in U.S. Family Finances from 2007 to 2010: Evidence from the Survey of Consumer Finances, http://1.usa.gov/1iYqY7T (June 2012) (viewed February 19, 2015).

[10] *See* http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_36319.pdf (Fannie Mae Form 1009, May 2004).

has checked the "Married" box involves a non-borrowing spouse.  Thus, a random sampling of HUD's loan files would provide an accurate estimate of the number of non-borrowing spouses. HUD's failure to consider its own data on HECM borrowers is arbitrary and capricious.

61.     The National Reverse Mortgage Lenders Association ("NRMLA"), an industry lobbying group, performed its own assessment of the cost to HUD of complying with the law.  In a June 2013 amicus brief it filed in the *Bennett II* case, NRMLA estimated there were **12,000** single-spouse HECM loans, only **2.7 percent** of the total number of outstanding HECM loans, far less than the 20 percent on which HUD based its cost estimate.[11]

62.     Given HUD's assertion that the insurance fund would suffer a "very substantial loss" if TID were extended to all surviving spouses, it is curious that HUD would make no mention whatsoever of the size or status of the insurance fund itself, which is essential to evaluating this assertion.

70.     HUD Secretary Julián Castro testified before the United States House of Representatives Committee on Financial Services on February 11, 2015, touting the robust health of the insurance fund.  Secretary Castro stated that the "Mutual Mortgage Insurance Fund is Back in the Black," "and **we have over $46 billion in available cash to pay claims**."[12]

63.     In addition, Secretary Castro stated, "The Administration estimates that the MMIF's value will still continue to increase by at least $7 billion a year for the next several

---

[11] Among other problems with HUD's analysis, it does not state the number of outstanding reverse mortgages on which it based its estimate.  Nor does it state how many spouses it believes will qualify for the MOE, although it appears that HUD used some number in calculating the impact on the insurance fund.

[12] *See* http://financialservices.house.gov/uploadedfiles/hhrg-114-ba00-wstate-jcastro-20150211.pdf, at 2 (viewed February 18, 2015) ("Castro Testimony") (emphasis added).

years," and that his agency projects the MMIF will is on target to reach the 2% capital ratio in Fiscal Year 2016.[13]

64.     Secretary Castro also stated that HUD has "strengthened underwriting standards, overhauled our loss mitigation process, and increased insurance premiums five times since 2010. The result of these actions is a $21 billion improvement to the value of the Mutual Mortgage Insurance (MMI) Fund in just two years."  Castro Testimony at 1.

65.     Based on these indicators, HUD has concluded that the fund is healthy enough that it can now substantially <u>lower</u> insurance premiums for new forward loans (but not HECMs), which constitute a substantial majority of the loans that FHA insures, by half a percentage point. *Id.* at 3-5.

66.     In sum, HUD fails to explain how a fund that currently contains <u>$46 billion</u> to pay claims, and is growing by <u>$7 billion per year</u>, will suffer a "substantial impact" by paying out $1.7 billion over a span of many years.

### HUD's Dual Statutory Mandates:
### To Protect Spouses from Displacement, and
### To Pay Lenders Funds to Which They Are Entitled

67.     Subsection (i) of the reverse mortgage statute states that in order to further the purposes of the reverse mortgage program, HUD must take any action necessary to provide reverse mortgage lenders with any funds they are entitled to under the reverse mortgage contracts.  12 U.S.C. § 1715z-20(i)(1).  Such actions may include, but are not limited to, paying funds from the FHA insurance fund, and accepting assignment of the mortgage.  12 U.S.C. § 1715z-20(i)(2).

---

[13] *Id.* at 6; HUD Annual Report to Congress, Nov. 17, 2014, http://1.usa.gov/1wIt7M7, at 52 (viewed March 4, 2015).

68.     Protecting spouses from displacement is an express purpose of the reverse mortgage program.  When a reverse mortgage loan comes due and payable due to the death of a HECM borrower, the borrower's spouse is entitled to protection from displacement even if he or she is not a named borrower on the mortgage.  And the lender is entitled to be paid funds it is owed. HUD has both the statutory power and the obligation to both protect these spouses from displacement, and to assure that lenders are paid.

***Janet Snyder***

69.     Janet Snyder and her husband, Theodore G. Snyder, purchased their home at 7832 Surfcrest Court, Las Vegas, Nevada in 2000.  Mrs. Snyder has lived there continuously for the past 15 years.

70.     Mr. and Mrs. Snyder were married in 1962.  Mrs. Snyder was a spouse for purposes of the HECM statute at all relevant times.

71.     Mr. Snyder suffered a stroke in 2006 or 2007.  He was gravely ill for long periods of time from then until his death in 2010.  During this time, while trying to care for him at home or visit him in the hospital, Mrs. Snyder was also working two jobs and raising their grandson. Mrs. Snyder suffered heart attacks in 2009 and 2012.

72.     On information and belief, a reverse mortgage was taken out on the Snyders' home on or around November 16, 2007.  Mrs. Snyder has never seen the reverse mortgage documents.  She believes that someone came to the house while Mr. Snyder was recovering from his stroke, and persuaded him to take out the loan.

73.     Although land records contain a deed in which Mrs. Snyder quitclaimed her interest in the property, to the best of her knowledge, Mrs. Snyder never executed such a document.

19

74.     Mrs. Snyder was unaware of the existence of the reverse mortgage until shortly before Mr. Snyder's death on July 28, 2010.

75.     Mrs. Snyder inherited the property and continues to reside in the home.

76.     After Champion Mortgage initiated foreclosure proceedings against the property, Mrs. Snyder attended an initial mediation, after which Champion was not to move forward with the foreclosure for six months.

77.     Champion Mortgage reinitiated foreclosure prior to the expiration of the six-month period.  A second mediation, of which Mrs. Snyder did not receive notice, was set. Because she failed to appear, she was deemed to have waived the mediation, allowing Champion to obtain and record a Certificate allowing it to proceed with the foreclosure.

78.     Mrs. Snyder's home is currently slated for sale at a foreclosure auction on **April 27, 2015**.

*Karen Hunziker*

1.     Karen Hunziker and her husband, Charles C. Hunziker, purchased their home at 3055 Sly Park Road, Pollock Pines, California, in 1997.  Ms. Hunziker has lived there continuously since that time.

2.     Mr. and Mrs. Hunziker were married on August 17, 1966.  Ms. Hunziker has been a spouse for purposes of the HECM statute at all relevant times.

3.     The Hunzikers met in 2006 with Steve Cockrell, the owner of Western Foothill Mortgage, in Placerville, California.  Mr. Cockrell told the couple that Mrs. Hunziker would have to come off the deed in order to obtain a reverse mortgage because she was under 62. When they expressed concern, the agent repeatedly assured them that Mrs. Hunziker could easily add her name to the mortgage and the deed when she turned 62.

4.     Without this assurance, the Hunzikers would not have taken out the reverse mortgage.

5.     At the time the Hunzikers took out their reverse mortgage, Mr. Hunziker was 65, and Mrs. Hunziker was 60.

6.     On the day her 62nd birthday, Mrs. Hunziker met with an attorney who specializes in trusts and estates to find out how to add her name back on the mortgage, as the reverse mortgage broker had promised.  The attorney responded that the only way to do that was to refinance the mortgage.

7.     The Hunzikers called the reverse mortgage company that sold them the reverse mortgage.  They responded that it would cost $60,000 to obtain a new reverse mortgage that added her as a borrower.

8.     Mr. Hunziker died on May 12, 2014.  Mrs. Hunziker received the notice that the loan was due and payable on May 22, 2014.

9.     In a July 30, 2014 letter, mortgage servicer Financial Freedom informed Mrs. Hunziker of her options for satisfying the loan.  Among other things, it stated that she would have to pay down the principal balance by approximately **$62,640.00** to qualify for the Mortgagee Optional Election, which she is not able to do.

10.     In order to put off the sale of the home, Mrs. Hunziker agreed to list it for sale. This allowed her to obtain several extensions of the sale date while she tried to avoid foreclosure. The appraised value of house is $133,000, and the balance on the loan is around $230,000.

11.     On February 10, 2015, HUD responded to Mrs. Hunziker's January 13, 2015 letter asking for relief from foreclosure, stating, "As noted in Mortgagee Letter 2015-03, nothing in that Mortgagee Letter confers any right to an Eligible Surviving Non-Borrowing Spouse to an

assignment.  Further, nothing in Mortgagee Letter 2015-03 interferes with any right of the mortgagee to enforce its private contractual rights under the terms of your husband's HECM."

12.     A trustee's sale was scheduled for April 10, 2015.  On March 26, 2015, the sale was re-noticed for **May 15, 2015** at 10 A.M., Pacific Time.

***Howard Gill, Jr.***

13.     Plaintiff Howard Gill, Jr. resides at 2954 Bald Mountain Road, Burnsville, North Carolina, where he lived with his wife, Gloria A. Gill, until her death in 2013.

14.     Mr. Gill is a veteran, having served in the United States Army from 1966 to 1972, and in the army reserves for four years after that.

15.     His brother, Ed Gill, has had power of attorney since 2013, due to the fact that Plaintiff has limited capacity to understand legal issues that have arisen since his wife's death.

16.     The Gills were married in March 1991, and bought the subject property in 1996.  They were both on the deed.  Mr. Gill has lived there continuously since 1996.

17.     Mrs. Gill obtained a reverse mortgage from Champion Mortgage on April 15, 2008.  She took it out without telling anyone else in the family.  When she explained the reverse mortgage to her husband, she repeatedly emphasized that if she died, he could continue living in the house.  On information and belief, Plaintiff signed a document quitclaiming his interest in the property, though he had no understanding of what this meant.

18.     At the time Mrs. Gill obtained the reverse mortgage, Mr. Gill was 61 years old, only a few months before his 62nd birthday.

19.     Mrs. Gill died on August 26, 2013.  About a month later, Plaintiff received a notice stating that the reverse mortgage was due and payable.

20.     The balance on loan is $158,367.  On information and belief, the house is worth under $100,000.

21.     Plaintiff received notice of a foreclosure hearing on June 3, 2015, and a public auction scheduled for **July 1, 2015**.

## CLASS ACTION ALLEGATIONS

79.     Plaintiffs bring this class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a class that includes any  surviving spouse of a Home Equity Conversion Mortgage borrower who was married to the borrower at the time the mortgage was consummated, was not listed as a borrower on the mortgage, and where the mortgage was consummated prior to August 4, 2014 and where the lender states that the mortgage is due and payable due to the death of the borrower, and the subject property has not been sold to a third party ("Class").  The Class seeks injunctive relief protecting them from displacement, and declaratory relief recognizing their status as surviving spouses entitled to protection from displacement.

80.     Pending the determination of a remedy, Plaintiffs seek a preliminary injunction enjoining HUD (1) from enforcing any requirement that lenders foreclose on a surviving spouse, if the only due and payable event that has occurred is the death of the borrower spouse; and (2) from paying insurance claims that are based on foreclosures against surviving spouses.

81.     The members of the Class are so numerous that joinder is impracticable. Plaintiffs are informed and believe that there are thousands of Class Members based on the fact that Defendant has insured thousands of new reverse mortgages per month for many years.  In October and November 2013 alone, Defendant endorsed 2,759 reverse mortgages.  In every year from 1990 to 2012, a majority of reverse mortgages were issued to a sole mortgagor.

82.     Common questions of law exist as to all members of the Class.  The primary question is whether HUD's long-standing regulations, and the regulations "issued" in Mortgagee Letter 2015-03 violate the HECM statute by failing to accord the non-borrowing spouse protection from foreclosure and displacement after the borrowing spouse dies.  The second question is whether, in light of the circumstances presented by Plaintiffs' foreclosures and those of the Class, HUD is required to act to protect them.  Plaintiffs' claims are based on the Administrative Procedure Act, the federal reverse mortgage statute, and its corresponding regulations.  Thus, they are amenable to decision on a class-wide basis.

83.     Plaintiffs' claims are typical of the claims of the members of the Class, for the reason that the Plaintiffs and the Class are facing foreclosure and eviction from their family homes due to Defendant's failure to protect them from displacement.  Plaintiffs and the Class stand to suffer grave and irreparable harm if HUD is not enjoined from denying them the relief it claimed was automatic in similar contexts.

84.     Plaintiffs are adequate representatives of the Class they seek to represent.  Their interests do not conflict with the interests of the individual members of the Class.  Plaintiffs have retained counsel who are competent and experienced in complex class actions, mortgage law, and administrative law.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

85.     Plaintiffs have suffered the same damage, and stand to suffer the same damage in the future, as Class Members generally, and they are intent on obtaining relief that will prevent the ultimate loss of their homes and those of Class Members.  Plaintiffs are fully committed to fairly, adequately, and vigorously representing and protecting the interests of the members of the Class.

86.     Pursuant to Federal Rule 23(b)(2), Plaintiffs and the Class are entitled to class certification, because Defendant (1) has violated the statute by passing regulations that contradict a core statutory protection; and (2) has refused to comply with its statutory mandate to protect them from displacement, making final injunctive relief and declaratory relief appropriate respecting the Class as a whole.  Without the injunctive relief Plaintiffs seek in this case, they will lose their homes.

## FIRST CLAIM FOR RELIEF

**HUD's Actions Are Arbitrary and Capricious or Otherwise Not
in Accordance with Law and Exceed HUD's Statutory Authority
in Violation of § 706(2) of the Administrative Procedure Act**

87.     Plaintiffs incorporate by reference as if fully set forth herein all of the allegations of the Complaint.

88.     Federal agency action is unlawful if it is arbitrary, capricious or otherwise not in accordance with law, or if it exceeds the agency's statutory authority. 5 U.S.C. § 706(2).

89.     The anti-displacement provision of the HECM statute provides the spouse of a HECM homeowner the same protection from displacement as the homeowner named on the mortgage.  *See* 12 U.S.C. § 1715z-20(j).

90.     The HECM statute's anti-displacement provision states that reverse mortgages must "provide[] that the homeowner's obligation to satisfy the loan obligation is deferred until the homeowner's death, sale of the property" or some other occurrence as identified by HUD.

91.     "Homeowner" is specially defined for purposes of 12 U.S.C. §1715z-20(j) to include a homeowner's spouse.  Spouses who are not named on the HECM mortgage are "homeowners" entitled to this protection.

92.     Plaintiffs and the Class Members are "homeowners" entitled to protection from displacement by the HECM statute.

93.      HUD failed to give effect to the plain meaning of the anti-displacement statutory mandate and has enacted regulations and adopted guidance that violate it and *require* lenders who do not opt for the MOE, or who find the spouse ineligible for the MOE, to foreclose on homeowner spouses after the death of the mortgagor as a prerequisite to filing a claim for insurance benefits.

94.     The following are arbitrary, capricious, and contrary to law:

a.     24 C.F.R. § 206.27(c), which requires the mortgage to state that it is "due and payable in full if a mortgagor dies and the property is not the principal residence of at least one surviving mortgagor."  HUD's regulations and Mortgagee Letter 2015-03 use the term "mortgagor" or "borrower," in violation of the HECM statute, which defines "homeowners" to include "spouses."

b.     24 C.F.R. § 206.125, to the extent that it requires the mortgagee to call the loan due and payable and foreclose on a surviving spouse.

c.     Mortgagee Letter 2015-03, which requires that unless the surviving spouse is eligible for the MOE and the mortgagee elects it, the mortgagee must call the loan due and payable and either foreclose or obtain a deed in lieu of foreclosure.  HUD is legally forbidden from requiring a loan to be called due and payable solely due to the death of a borrowing spouse, where a surviving spouse remains in the property.

d.   Mortgagee Letter 2015-03, the Determination on Remand, and any other regulations or guidance, to the extent that they require the mortgagee to "elect" some alternative action to foreclosure, and if they do not, must adhere to HUD's foreclosure guidelines on surviving spouses.  HUD is statutorily forbidden from requiring a lender to foreclose on a surviving spouse, unless some other due and payable event has occurred.

e.   Mortgagee Letter 2015-03, which ignores the ruling in *Bennett v. Donovan,* purports to establish new due and payable events for existing HECMs, and establishes a new "trigger" to enforce HUD's foreclosure deadlines, all in violation of the statutory protection for surviving spouses. HUD does not have the power to amend a federal statute.

f.   Mortgagee Letter 2015-03's directive that mortgagees may file and be paid insurance claims premised on foreclosures based solely on the death of a borrowing spouse, where a surviving spouse remains in the property.

g.   To the extent that HUD bases Mortgagee Letter 2015-03 and its Determination on Remand in *Plunkett II* on its concern for the Mutual Mortgage Insurance Fund, its denial of relief is arbitrary and capricious, an abuse of discretion, and violates the anti-displacement provision.

h.   HUD's refusal to grant TID relief to other surviving spouses.

i.   HUD's imposition of time restrictions and other conditions on TID relief to the original Plaintiffs in this case.

j.   HUD's refusal to grant an extension of time for the Bennett and Plunkett mortgagor to accept the TID and qualify them for relief.

95.     Plaintiffs and Class Members have been injured and continue to be injured by HUD's failure to accord them the protections provided by 12 U.S.C. § 1715z-20(j).

96.     The Reverse Mortgage Stabilization Act ("RMSA") does not permit HUD to adopt new regulations or guidance that are contrary to explicit statutory protections of the HECM program.

97.     Plaintiffs and the Class are entitled to declaratory relief, as set forth in their Prayer for Relief.

## SECOND CLAIM FOR RELIEF

### HUD Has Unlawfully Withheld Actions that Are Necessary to Suspend Its Foreclosure Requirements for Surviving Spouses, in Violation of Section 706(1) of the Administrative Procedure Act

98.     Plaintiffs incorporate by reference as if fully set forth herein all of the allegations of the Complaint.

99.     The Administrative Procedure Act, 5 U.S.C. § 706(1), empowers this court to "compel agency action unlawfully withheld or unreasonably delayed."

100.     The ruling in *Bennett II* invalidating 24 C.F.R. § 206.27(c)(1) applies with equal force to Plaintiffs and the Class.

101.     The Court remanded this matter to HUD a third time after HUD had conceded that its regulation requiring foreclosure on surviving spouses was a violation of the reverse mortgage statute:  "As a result of the invalidation of 24 C.F.R. § 206.27(c)(1), section 206.125 no longer requires, and cannot require the mortgagees holding plaintiffs' spouses mortgages to institute and prosecute foreclosure proceedings within specified timeframes as a result of the spouses' deaths."  Dkt. No. 37-1 at 23-24; Dkt. No. 47 at 25.

102.    Yet in its Determination on Remand and Mortgagee Letter 2015-03, HUD states that it will continue enforcing the foreclosure requirements and timelines in its regulations, unless the lender "elects" the MOE, and the spouse can qualify for it, which is highly unlikely.

103.    The mortgages are due and payable according to their terms; they are not due and payable under the regulations and insurance contract.

104.    In order to both protect surviving spouses and pay lenders funds to which they are entitled, it is "necessary" that HUD offer to accept assignment of the mortgages of Plaintiffs and the Class, and to pay lenders' claims based on those assignments, pursuant to the mandate of 12 U.S.C. § 1715z-20(i).

105.    In addition, HUD must make lenders whole, which includes the payment of any amounts that have accrued on the loans while the *Bennett* and *Plunkett* actions have been pending.

106.    Plaintiffs and the Class are entitled to declaratory and injunctive relief as fully set forth in their Prayer for Relief.

### THIRD CLAIM FOR RELIEF

**HUD Has Violated Section 706(1) of the Administrative Procedure Act
By Unlawfully Withholding Action Necessary to Ensure that
Lenders Are Provided With Funds to Which They Are Entitled**

107.    Plaintiffs incorporate by reference as if fully set forth herein all of the allegations of the Complaint.

108.    24 C.F.R. § 206.123 sets out the conditions under which a lender may submit an FHA insurance claim. If the loan is due and payable, the lender must foreclose or obtain a deed in lieu of foreclosure, and then sell the property as provided in 24 C.F.R. §§ 206.125-129, in order to make a claim for the payment of mortgage insurance benefits.

109.    Alternatively, if the loan is not due and payable, 24 C.F.R. § 206.123 sets out conditions under which a lender may file an FHA claim after assignment of the loan to HUD.

110.    In *Bennett II,* this Court held that 24 C.F.R. § 206.27(c) is illegal as applied to surviving spouses.  HUD has conceded that loans in the *Bennett* and *Plunkett* cases are not due and payable under HUD's regulations and the insurance contract and that it could not legally require a lender to foreclose on a surviving spouse as a condition of filing an insurance claim.

111.     Plaintiffs and the Class are surviving spouses who are similarly situated to the *Bennett* and *Plunkett* plaintiffs.  They are "homeowners" entitled to protection from displacement.  Their loans are not due and payable under HUD regulations or the insurance contract.

112.    Because the loans of Plaintiffs and the Class are not due and payable under the regulations and insurance contract, there is no valid basis for an FHA claim based on foreclosure against them.

113.    Under the terms of the mortgage, the lender is entitled to repayment when the loan comes due and payable according to its terms.

114.    The HECM statute states, "Notwithstanding any other provision of law," HUD "*shall* take any action *necessary* . . . to provide any mortgagee . . . with funds . . . to which the mortgagee is entitled under the terms of the insured mortgage . . ." 12 U.S.C. § 1715z-20(i) (emphasis added).

115.    Because the mortgages are not due and payable under the regulations and insurance contract, it is "necessary" that HUD offer to accept assignment of the mortgages of Plaintiffs and the Class, and to pay lenders' claims based on those assignments, pursuant to the mandates of 12 U.S.C. § 1715z-20(i).

116.    In addition, HUD must make lenders whole, which includes the payment of any amounts that have accrued on the loans while the *Bennett* and *Plunkett* actions have been pending.

117.    Plaintiffs and the Class are entitled to declaratory and injunctive relief as fully set forth in their Prayer for Relief.

## FOURTH CLAIM FOR RELIEF

### HUD's Failure to Treat Similarly Situated People the Same Is Arbitrary and Capricious, Not in Accordance with Law, and Exceeds HUD's Authority Under § 706(1) & (2) of the Administrative Procedure Act

118.    Plaintiffs incorporate by reference as if fully set forth herein all of the allegations of the Complaint.

119.    A government agency acts arbitrarily and capriciously, and illegally, when it treats similarly situated people differently.

120.    Plaintiffs and the Class are surviving spouses who are substantially similar to the Plaintiffs in the *Bennett* and *Plunkett* cases.

121.    HUD's refusal to accord all Plaintiffs and the Class the same relief accorded to the *Bennett* and *Plunkett* plaintiffs was arbitrary and capricious, and otherwise illegal under the APA.

122.    Plaintiffs and the Class are entitled to declaratory and injunctive relief as fully set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a)      Enter a declaratory judgment stating the following:

1.   HUD has failed to properly implement the anti-displacement protections in the HECM statute, has illegally adopted regulations and guidance that contravene this protection, and that the Plaintiffs and the Class are "homeowners" entitled to protection from displacement.  12 U.S.C. § 1715z-20(j);

2.   the mortgages of Plaintiffs and the Class are not due and payable under HUD regulations and the insurance contract;

3.   HUD's denial of TID relief to Plaintiffs and the Class is arbitrary and capricious;

4.   24 C.F.R. §§ 206.27(c)(1) and 206.125, Mortgagee Letter 2015-03, HUD's Determination on Remand, and any other regulations, rules or guidance that require lenders to foreclose on a surviving spouse, where the loan is not due and payable for any reason other than the death of the borrower spouse, are arbitrary and capricious and/or contrary to law;

5.   HUD's failure to treat the Class the same as similarly situated persons is arbitrary and capricious and/or contrary to law; and

6.   24 C.F.R. §§ 206.27(c)(1) and 206.125, Mortgagee Letter 2015-03, HUD's Determination on Remand, and any other regulations, rules or guidance that permit the payment of an insurance claim based on foreclosing on a surviving spouse is arbitrary and capricious and/or contrary to law;

b)   Enjoin Defendant, on a preliminary and permanent basis:

1.   from enforcing 24 C.F.R. § 206.27(c)(1), § 206.125, Mortgagee Letter 2015-03, and any other regulation, rule or guidance requiring mortgagees to foreclose on surviving spouses if no due and payable event other than the death of the borrower spouse has occurred;

2.   to offer lenders the opportunity to assign any loan where the only due and payable event that has occurred is the death of the borrower spouse, and the non-borrower spouse is still living in the property;

3.   from refusing to accept assignment and fully compensate the lender for any loan that is due and payable by its terms because of the death of the borrower spouse but is not due and payable under the reverse mortgage statute;

4.   from foreclosing on any mortgage that has been assigned to HUD, where the loan is not due and payable by its terms for any reason other than the death of the borrower spouse;

32

5.      to issue formal guidance to lenders that the loans on surviving spouses' homes are not due and payable, that they need take no further action to foreclose unless the loan comes due and payable for some other reason, and that their loans are eligible for assignment to HUD when they reach 98 percent of the maximum claim amount, pursuant to Part 206, Subpart C of the Code of Federal Regulations;

6.      to instruct lenders that they cannot file an insurance claim after foreclosure on a surviving spouse where the loan is not due and payable for any reason other than the death of the borrower spouse, but that they may assign the loan to HUD, and file an insurance claim instead;

7.      from paying claims based on foreclosures against a surviving spouse, where the loan is not due and payable for any reason other than the death of the borrower spouse, rather than offering to accept assignment of such loans; and

8.      from setting any deadlines to qualify for relief, for both mortgagees and mortgagors, where the loan is only due and payable due to the death of the borrower spouse;

c)      Award plaintiffs costs and attorney fees under 28 U.S.C. § 2412 or as otherwise permitted;

d)      Grant all other appropriate relief; and

e)      Retain jurisdiction of this action to grant ongoing relief as may be required.

Dated: April 15, 2015

Respectfully submitted,

*/s/ Craig L. Briskin*

Craig L. Briskin (D.C. Bar No. 980841)
(cbriskin@findjustice.com)
Steven A. Skalet (D.C. Bar No. 359804)
(sskalet@findjustice.com)
Mehri & Skalet, PLLC
1250 Connecticut Avenue NW
Suite 300
Washington, DC 20036
Tel:  202-822-5100
Fax:  202-882-4997

**Counsel for Plaintiffs**